IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

BENJAMIN J. ACOSTA,

Case No. 6:14-cv-01458-KI

Petitioner,

OPINION AND ORDER

v.

J. PREMO, Superintendent, Oregon State
Penitentiary,

Respondent.

**KING, Judge.**

Petitioner brings this habeas corpus proceeding pursuant to 28 U.S.C. § 2254. For the reasons

set forth below, this Court denies Petitioner's Amended Petition for Writ of Habeas Corpus (ECF

No. 19).

## BACKGROUND

On August 18, 2008, Petitioner was indicted on charges of Sodomy in the First Degree,

Assault in the Fourth Degree, and Burglary in the First Degree. Petitioner waived his right to a jury

trial and proceeded to a bench trial. Resp't Ex. 117. At trial, the prosecution presented the testimony

of Robert Pettitt (the victim), Jessica Harrison (the on-site manager at the victim's apartment

1 - OPINION AND ORDER

complex),[1] and two Portland police officers. Pettitt testified that Petitioner came to his apartment on the evening of July 4, 2008, and demanded to be let in. Tr. at 75, 77-78, 83-85, 119-20. According to Pettitt, when he opened the door, Petitioner struck him in the chin and pushed his way into the apartment. *Id.* 86-87. Pettitt testified that after being in the apartment for a period of time, Petitioner unzipped his pants, grabbed Pettitt by the "nape of the neck," pushed his head down, and forced him to put Petitioner's penis in his mouth. *Id.* at 93, 95-97, 100, 112. The defense presented no witnesses.

The judge convicted Petitioner of Sodomy in the First Degree and Burglary in the First Degree, but acquitted Petitioner on the assault charge. Resp't Ex. 101. The Court sentenced Petitioner to a Measure 11 mandatory minimum sentence of 100 months for Sodomy, a concurrent 66-month term for Burglary, and three years post-prison supervision. *Id.*

Petitioner filed a direct appeal assigning error to the trial court's denial of his Motion for Acquittal on the sodomy charge. Resp't Ex. 104 at 4. Petitioner reasoned that although he used force to enter the victim's apartment, he did not compel Pettitt to perform oral sex by using physical force or the threat of physical injury or death. *Id.* at 5-6; Resp't Ex.106 at 5. The Oregon Court of Appeals affirmed without opinion, and the Oregon Supreme Court denied review. *State v. Acosta*, 253 P.3d 1081 (Or. App.), *rev. denied*, 258 P.3d 527 (Or. 2011).

Petitioner sought state post-conviction relief (PCR), alleging five instances of ineffective assistance of counsel. Resp't Ex. 109. The PCR court denied relief, holding that Petitioner's testimony was not credible, and that trial counsel did not render ineffective assistance of counsel.

---

[1] Pettitt's apartment complex is operated by Cascadia Behavioral Health Care and its residents have "some sort of mental health diagnosis." Tr. at 32-33. Petitioner was formerly a tenant of the complex and Pettitt's neighbor. *Id.* at 35, 76, 78.

Resp't Ex. 124 at 20-21, Ex. 125. Petitioner's appellate counsel filed a direct appeal and submitted a *Balfour* brief. Resp't Ex. 126.[2] Petitioner filed a section B to the *Balfour* brief raising the same claims presented to the PCR court. *Id.* The Oregon Court of Appeals affirmed the PCR court without opinion, and the Oregon Supreme Court denied review. *Acosta v. Franke*, 329 P.3d 814 (Or. App.), *rev. denied*, 333 P.3d 333 (Or. 2014).

In the instant proceeding, Petitioner raises three grounds for relief with several subparts: (1) insufficiency of the evidence; (2) ineffective assistance of trial counsel (seven particulars); and (3) ineffective assistance of appellate counsel. In his supporting brief, Petitioner addresses his insufficiency of the evidence claim, and four claims of ineffective assistance of counsel. Respondent moves the Court to deny habeas relief on the basis that Petitioner has failed to sustain his burden to demonstrate habeas relief is warranted on the unargued grounds; he procedurally defaulted Ground One and Ground Two, subpart F; and the remaining portions of Ground Two lack merit.

## STANDARDS

Pursuant to 28 U.S.C. § 2254(d), a petition for writ of habeas corpus filed by a state prisoner shall not be granted, with respect to any claim that was adjudicated on the merits in state court, unless the adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law;" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1) & (2); *Harrington v. Richter*, 562 U.S. 86, 100 (2011); *White v. Woodall*, 134 S.Ct. 1697, 1702 (2014).

---

[2] *See State v. Balfour*, 814 P.2d 1069, 1080 (Or. 1991) (setting forth procedure to be followed when appellate counsel believes appeal has no merit).

A state court unreasonably applies clearly established federal law, if its decision is "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Richter*, 562 U.S. at 103; *Woodall*, 134 S.Ct. at 1702. A state court's factual determination is not unreasonable merely because the federal habeas court would reach a different conclusion in the first instance. *Brumfield v. Cain*, 135 S.Ct. 2269, 2277 (2015); *Burt v. Titlow*, 134 S.Ct. 10, 15 (2013). "Instead, § 2254(d)(2) requires that [this Court] accord the state trial court substantial deference." *Brumfield*, 135 S.Ct. at 2277. If reasonable minds reviewing the record might disagree about the finding in question, habeas relief is not warranted. *Id.*

## DISCUSSION

### I.   Ground One - Insufficiency of the Evidence

In his first ground for relief, Petitioner contends that there was insufficient evidence to establish the necessary elements of Sodomy in the First Degree *and* Burglary in the First Degree. Am. Pet. at 3; Pet'r's Br. in Supp. at 17-19. For the reasons set forth below, this Court concludes that Petitioner procedurally defaulted this claim with respect to his burglary conviction, and that the state court's rejection of this claim as it relates to his sodomy conviction is neither contrary to nor an unreasonable application of clearly established federal law.

#### A.   Procedural Default

Generally, a state prisoner must exhaust all available state court remedies either on direct appeal or through collateral proceedings before a federal court may consider granting habeas corpus relief. 28 U.S.C. § 2254(b)(1). A state prisoner satisfies the exhaustion requirement by "fairly presenting" his claim to the appropriate state courts at all appellate stages afforded under state law. *Castille v. Peoples*, 489 U.S. 346, 351 (1989); *Baldwin v. Reese*, 541 U.S. 27, 29 (2004); *Carrillo-*

*Carrillo v. Coursey*, 823 F.3d 1217, 1220 (9th Cir. 2016); *Casey v. Moore*, 386 F.3d 896, 915-16 (9th Cir. 2004). If the petitioner procedurally defaults his available state remedies, habeas relief is precluded absent a showing of cause and prejudice, or that the failure to consider the defaulted claims will result in a fundamental miscarriage of justice. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Petitioner procedurally defaulted his claim that there was insufficient evidence to support his conviction for *Burglary in the First Degree* because he did not fairly present the claim to the Oregon Court of Appeals and Supreme Court. On the contrary, on direct appeal Petitioner limited his challenge to his conviction for Sodomy in the First Degree, arguing that there was insufficient evidence of forcible compulsion under Or. Rev. Stat. § 163.405(1)(a). Resp't Ex. 104 at 5; Ex. 106 at 5. Because Petitioner can no longer raise this claim in state court, the claim is procedurally defaulted. *See* Or. Rev. Stat. § 138.071(1) (thirty-day limitation period for direct appeal); Or. Rev. Stat. § 138.510(3) (two-year limitation period for PCR petition); *see also* Or. Rev. Stat. § 138.550(4) (requiring petitioner to raise all available claims in first PCR petition). Petitioner has made no showing to excuse his procedural default. Accordingly, habeas relief is precluded on Petitioner's claim that there was insufficient evidence to convict him of Burglary in the First Degree.

With respect to Petitioner's assertion that there was insufficient evidence to support his conviction for Sodomy in the First Degree, this Court assumes without deciding that Petitioner exhausted this claim, by raising it on direct appeal *under state law*, because the state and federal standards for insufficiency of the evidence are identical. *See Gillespie v. Taylor*, No. 2:14-cv-00062-JE, 2015 WL 10713687, at *4-5 (D. Or. 2015) (holding that although petitioner "failed to explicitly refer to federal law in his state court proceedings," petitioner fairly presented federal insufficiency

5 - OPINION AND ORDER

of the evidence claim because state and federal standards are identical); *Wieland v. Thompson*, No. 3:10-cv-00059-MA, 2013 WL 550504, *2-3 (D.Or. 2013), *aff'd on other grds.*, 583 F. App'x 792 (9th Cir. 2014) (same). However, as set forth below, this Court concludes that Petitioner's insufficiency of the evidence claim lacks merits.

### B.    Evidence of Forcible Compulsion

"[E]vidence is sufficient to support a conviction whenever, 'after viewing the evidence in light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Parker v. Matthews*, 132 S.Ct. 2148, 2152 (2012) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Cavazos v. Smith*, 132 S.Ct. 2, 6 (2011). "[A] state-court decision rejecting a sufficiency challenge may not be overturned on federal habeas [review] unless the decision was objectively unreasonable." *Parker*, 132 S.Ct. at 2152; *Cavazos*, 132 S.Ct. at 4. Although the sufficiency of the evidence inquiry is grounded in the Fourteenth Amendment, the standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law. *Creech v. Frauenheim*, 800 F.3d 1005, 1012 (9th Cir. 2015); *Jackson*, 443 U.S. at 324, n.16.

Under Oregon law, a person "who engages in deviate sexual intercourse with another person" commits the crime of Sodomy in the First Degree if "[t]he victim is subjected to forcible compulsion by the actor." Or. Rev. Stat. § 163.405(1)(a). "Deviate sexual intercourse" is defined as "sexual conduct between persons consisting of contact between the sex organs of one person and the mouth or anus of another." Or. Rev. Stat. § 163.305(1). "'Forcible compulsion' means to compel by: (a) Physical force; or (b) A threat, express or implied, that places a person in fear of immediate or future death or physical injury to self or another person . . . ." Or. Rev. Stat. § 163.305(2).

6 - OPINION AND ORDER

To prove forcible compulsion by "physical force," there must be evidence that the force "was greater in degree or different in kind from the simple movement and contact that is inherent in the act of touching the intimate part of another and that the force was sufficient to compel the victim to submit to or engage in the sexual contact, against the victim's will." *State v. Marshall*, 253 P.3d 1017, 1028 (Or. 2011). To prove forcible compulsion by a "threat, express or implied," there must be evidence of some kind of communication by the defendant to the victim of intent to inflict harm." *State v. Kawamoto*, 359 P.3d 305, 313 (Or. App. 2015) (internal quotation omitted). "[A] defendant's 'extended episode of violence directed at [a] victim' may communicate 'an intent to inflict harm on the victim that was sufficient to compel [him or] her to submit to the sexual contact at issue.'" *Id.* (*quoting State v. Jimenez*, 270 P.3d 405, 409 (Or. App. 2012)).

Petitioner argues that there was insufficient evidence of forcible compulsion because "any force associated with Acosta's entry into the apartment was too remote in time to prove forcible compulsion six hours later when the alleged sodomy occurred." Pet'r's Br. in Supp. at 18-19. Petitioner further argues that any threats he allegedly made to Pettitt had no nexus or connection to the alleged deviate sexual act:

> The only evidence that Acosta used physical force in relation to the alleged sodomy is Pettitt's testimony that six hours after Acosta arrived, he unzipped his pants, took Pettitt by the nape of the neck with one hand, said "suck my dick," and "forced" Pettitt's head down. Pettitt testified that he said: "Ben, don't do this . . . I don't want to do this," but Acosta "put [his] head down on [Acosta's] dick," and that he did not resist because he was concerned Acosta would break his beer bottle and cut his throat. . . . Evidence that a purported victim imagined a threat is insufficient as a matter of law to prove forcible compulsion. Even though there was evidence that Acosta threatened Pettitt, the threats had no connection to any alleged deviate sexual act, but, rather, related to $50 that Acosta was asking Pettitt to give him. There was no nexus or connection between the threat and the sodomy. For these reasons, the State failed to produce sufficient evidence to satisfy the elements of the sodomy charge.

7 - OPINION AND ORDER

*Id.* at 19.

At trial, Pettitt testified that Petitioner hit him in the chin and pushed his way into Pettitt's

apartment. Once inside, Petitioner made threatening and irrational comments over the course of six

hours, and ultimately grabbed Pettitt by the back of the neck and forced him to perform oral sex:

> Q    I want to talk to you about July 4th. Did Mr. Acosta come to the back and yell for you at some point on that day?
>
> A    Yes, he did. . . . It was about 10:00, 9:30, quarter to 10:00, and he yelled up.
>
> . . . .
>
> He said, "I know you are fucking in that apartment." He says, "I can hear your TV." He said "I am going to give you five minutes to answer your door or I'm going to break your fucking door down."
>
> . . . .
>
> Q    Okay. So . . . you open the door and, you know, cursed at him saying, "What do you want?" And what happened then?
>
> A    He had a 40-ounce bottle of Camas beer in one hand and he punched me in the jaw with one hand and I staggered back into my kitchen.
>
> . . . .
>
> A    . . . [H]e locked the lock. He grabbed me by the elbow and he said, "You can make this easy on yourself or you can make it hard on yourself."
>
> . . . .
>
> A    And I said to him, "I can't believe you fucking hit me." He said, "I didn't hit you, Robert. That was a tap." He said, "If I hit you, I would knock you out or I would kill you."
>
> . . . .
>
> A    I told him that to calm down. He sat there drinking his beer telling me what a warrior he is . . . . He said, "Only weak people need apartments and food in the refrigerator. I'm a warrior. I'm military trained."

8 - OPINION AND ORDER

He said, "I see you and you don't see me." He said, "It's not just me you got to worry about." He said, "It's like an octopus." He said, "I got tentacles all over the neighborhood." And I knew what he meant. He meant with the drug dealers he was dealing with . . . .

. . . .

Q    Okay. Take us through what happened next.

A    We sat there, watched TV, he talked, drank his beer.

Q    What types of things was he talking about?

A    He was talking about being in the military. How he was military trained and he kept saying, "You know, Robert, don't fuck with me." I said, "Ben, I know you, I've known you." He said, "No, you don't know me."

He said, "You really don't know me." He said, "I will fucking kill you. If you don't give that $50 tomorrow," he said, "I will chop you up and put you in a plastic bag and toss you into a dumpster." And when I looked him in the eye, he meant what he said.

Q    Okay. Then what happened?

A    . . . . So we sat there and watched TV a little longer, probably around probably 4:00, 4:30, 4:15, out of the corner of my -- I turn, I look, he is unzipping his pants and he grabbed me by the nape of the neck and he said, "Suck my dick."

. . . .

Q    So . . . that's about six hours. What's going on during that time?

A    He kept on talking about how I needed to be spiritual, how spiritual . . . he was, how he was a warrior. He kept repeating the stuff over and over and over, again, like a drunk.

. . . .

A    How much disrespect I had thrown on him and, you know, how everybody else in the building had treated him like shit and thrown him out and I was the only one left in the building and you better not disrespect me and this and that. I mean, it was just nonsense.

9 - OPINION AND ORDER

. . . .

Q      Okay. All right. You mentioned that he grabbed you by the back of your neck. Was that with one hand or two hands or do you know?

A      He grabbed me with one hand. He said, "Suck my dick."

. . . .

A      I said, "Ben, don't do this." I said, "I don't want to do this." He said, "Suck it just a little while; suck my dick." And he put my head down on his dick.

Q      When you state put your head down, are you meaning he used pressure?

A      Yeah, he forced me on it.

Q      Okay. Did you try to fight or struggle back at that?

A      Nope, I did exactly what he told me to do. . . . And all I can think to myself is, "If I don't do what he says to do, he could break that beer bottle and cut my throat."

Tr. at 83-84, 86-88, 93-96, *see also* Tr. at 117.

Jessica Harrison, the apartment complex manager, testified that the morning after the incident, Pettitt reported to her that Petitioner sexually assaulted him. *Id.* at 36. She advised Pettitt to contact the police. *Id.* Portland Police Officer Joseph Cook responded to Pettitt's call and interviewed him at his apartment. *Id.* at 46-47. According to Cook, Pettitt stated that on the evening of July 4, 2008, Petitioner banged on his door and when Pettitt opened it, Petitioner hit him in the chin and pushed his way into his apartment. *Id.* at 48, 67. Pettitt told Cook that Petitioner grabbed him by the back of the neck and "forced [him] to suck his dick." *Id.* at 72. Cook observed no marks or swelling on Pettitt's face or neck. *Id.* at 54, 56, 68-69, 72. Cook testified that although he did not write in his report the time period between Petitioner's entry into the apartment and the sodomy, it was his understanding that once on the couch, the sodomy occurred within approximately twenty

10 - OPINION AND ORDER

minutes. *Id.* at 57-59. Cook could not recall whether Pettitt told him that Petitioner made threats of violence, but he conceded that there was no reference to threats in his incident report. *Id.* at 56.

Portland Police Detective Jeff Sharp also interviewed Pettitt and testified that he stated that Petitioner threatened to kill him and "gut him," and that he was in the apartment for several hours before the sodomy occurred. *Id.* at 150-52, 157-59. Officer Sharp testified that he subsequently interviewed Petitioner and believed that he was feigning a mental illness. *Id.* at 131, 139-40,

Although there were some arguable inconsistencies or omissions in Pettitt's statements to police, a rational trier of fact could find beyond a reasonable doubt that Pettitt's testimony was credible, that Petitioner used physical force against Pettitt by grabbing his neck and pushing his head down, and that the force was sufficient to compel Pettitt to engage in oral sex against his will. *See Marshall*, 253 P.3d at 1028 (reasonable jury could conclude that defendant used forcible compulsion by forcing the victim's hand down his pants and against his penis). This is particularly true given the fact that Pettitt is legally blind, suffers from an anxiety disorder, his cell phone was not working, and he was isolated in his apartment with Petitioner in the early morning hours. *See* Tr. at 76, 89; *Marshall*, 253 P.3d at 1027-28 (considering victim's age, circumstances, and physical setting when determining whether physical force compelled the sexual act).

Further, a rational trier of fact could find beyond a reasonable doubt that Petitioner's violent behavior when entering Pettitt's apartment, and his threatening and irrational comments throughout the evening constituted an implied or express threat of harm which compelled Pettitt to engage in the sodomy. This is true regardless of the fact that the episode lasted approximately six hours, and Petitioner's violent act of hitting Pettitt in the face occurred at the beginning of the episode. *See Jimenez*, 270 P.3d at 409 (holding that jury could conclude that defendant's violent behavior during

11 - OPINION AND ORDER

first encounter constituted an implied threat of violence in the second encounter on the same day).

Accordingly, the state courts' rejection of Petitioner's insufficiency of the evidence claim is neither

contrary to, nor an unreasonable application of, clearly established federal law.[3] *See* 28 U.S.C. §

2254(d)(1).

## II.     Ground Two - Ineffective Assistance of Trial Counsel

The Supreme Court has established a two-part test to determine whether a petitioner has

received ineffective assistance of counsel. First, the petitioner must show that his lawyer's

performance fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S.

668, 686-687 (1984). This Court's review of counsel's assistance is "doubly deferential" in that this

Court takes a highly deferential look at counsel's performance under the deferential lens of §

2254(d). *Cullen v. Pinholster*, 563 U.S. 170, 196 (2011). When applying this deferential standard,

it is not for this Court to second guess counsel's strategic decisions. *Strickland*, 466 U.S. at 689;

*Elmore v. Sinclair*, 799 F.3d 1238, 1250 (9th Cir. 2015), *cert. denied* (2016).

Second, a petitioner must show that his lawyer's performance prejudiced the defense. The

test for prejudice is whether the petitioner can show "that there is a reasonable probability that, but

for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694. A reasonable probability is one which is sufficient to undermine

---

[3] To the extent that Petitioner is also asserting a due process violation or freestanding claim of actual innocence (*see* Pet'r's Br. in Supp. at 19-20), this Court denies habeas relief because the claim was not pled in his Amended Petition, the claim was procedurally defaulted in state court, the Supreme Court has yet to recognize a freestanding claim of actual innocence and, in any event, Petitioner has not affirmatively proven that he is probably innocent. *See Moon v. Coursey*, No. 3:10-cv-00616-BR, 2016 WL 4059659, at *11-12 (D. Or. 2016) (addressing cognizability and standards governing due process and freestanding claims of actual innocence).

confidence in the outcome of the trial. *Id.* at 696. In evaluating proof of prejudice, this Court

considers the totality of the evidence. *Id.* "[A] verdict or conclusion only weakly supported by the

record is more likely to have been affected by errors than one with overwhelming record support."

*Id.*

## A.    "Failing to Articulate Available Meritorious Arguments for Acquittal" (Grounds 2(E) and (F))

In Ground Two of his Amended Petition, Petitioner alleges seven instances of ineffective

assistance of counsel. Am. Pet. at 3-4. In Ground 2(E), Petitioner alleges that trial counsel was

deficient in moving for a judgment of acquittal. In Ground 2(F), Petitioner alleges a multitude of

deficiencies in counsel's performance at trial, including opening statements, cross-examination, and

closing argument. *Id.* at 4. In his supporting brief, under the heading "Counsel Was Ineffective for

Failing to Articulate Available Meritorious Arguments for Acquittal" (*see* Pet'r's Br. in Supp. at 21),

Petitioner conflates Grounds 2(E) and (F), arguing that defense counsel:

> (1) raised only a general motion for judgment of acquittal and never articulated the elements the State was obligated to prove to establish burglary and sodomy, did not tell the court why the State's evidence was insufficient, and did not counter the State's central argument that Pettitt was credible;
>
> (2) twice failed to object to improper vouching and failed to effectively develop evidence, through cross-examination or defense witnesses, to counter the prosecution's position that Pettitt was credible;
>
> (3) failed to develop any alternative narrative of what occurred or supply reasons why Pettitt would have fabricated his story;
>
> (4) failed to establish through cross examination of Pettitt or the interviewing detective that Pettitt had told inconsistent stories;
>
> (5) in his opening statement, motion for judgment as a matter of law, and closing arguments, did not address the elements of the offenses, made inappropriate

arguments, and failed to identify the ten major discrepancies he intended to prove at trial; and

(6) failed to articulate effective arguments (relative to the elements of the offenses) in support of his motion for acquittal and during closing argument.

Pet'r's Br. in Supp. at 21-25. Petitioner concludes that "[b]ut for counsel's failure, the trial court would have been required to grant acquittal." *Id.* at 25.

Respondent correctly notes that Petitioner procedurally defaulted Ground 2(F) by failing to include it in his Amended Petition for Post-Conviction Relief (Resp't Ex. 109) or an appeal from the denial of post-conviction relief (*see* Resp't Exs. 127, 128). Petitioner has not demonstrated cause and prejudice to excuse his default, or demonstrate that a fundamental miscarriage of justice will ensue if this Court fails to consider the claim. Accordingly, habeas relief is precluded as to the allegations contained in Ground 2(F).

In Ground 2(E), Petitioner alleges that trial counsel failed "to perform effectively with regard to the motion for judgment of acquittal, including failing to make viable legal arguments. Am. Pet. at 4. At the state PCR proceeding, Petitioner argued that "[t]he evidence introduced by the state at trial was not sufficient to establish the element of forcible compulsion as defined in ORS 163.305." Resp't Exs. 109, 110, 126, 128. In the instant proceeding, in contrast, Petitioner focuses on different deficiencies, arguing that trial counsel rendered ineffective assistance when he moved for a judgment of acquittal without "articulat[ing] the elements that the State was obliged to prove to establish *burglary and sodomy*, nor told the court why the State's evidence was insufficient, nor countered the State's central argument, which was that Pettitt's story was credible and that he had no reason to lie." Pet'r's Br. in Supp. at 21 (emphasis added).

To the extent that Petitioner is arguing that trial counsel was ineffective when he moved for a judgment of acquittal on the *burglary charge*, the claim is procedurally defaulted because Petitioner did not raise the claim in his Amended PCR Petition or on appeal from the denial of post-conviction relief. Petitioner has not demonstrated cause and prejudice to excuse his default or that a fundamental miscarriage of justice will ensue if this Court refused to consider the claim.

To the extent that Petitioner is arguing that trial counsel was ineffective when he moved for a judgment of acquittal on the sodomy charge, this Court will consider Petitioner's arguably new contentions in support of the claim because they do not fundamentally alter it. *See Dickens v. Ryan*, 740 F.3d 1302, 1318-19 (9th Cir. 2014) (claim is fairly presented to state courts for purposes of exhaustion provided new factual allegations do not fundamentally alter the claim considered by the state courts).

Nevertheless, as discussed above, there was sufficient evidence for a rational trier of fact to conclude all elements of Sodomy in the First Degree were satisfied beyond a reasonable doubt. For the same reason, this Court concludes that Petitioner has failed to demonstrate a reasonable probability that, but for trial counsel's failure to (1) articulate the elements of the offense, (2) tell the court why the State's evidence was insufficient, (3) counter the State's argument that Pettitt was credible, or (4) challenge the evidence of forcible compulsion when moving for a judgment of acquittal, the trial court would have granted an acquittal. *See State v. White*, 154 P.3d 124, 129 (Or. App. 2007) (setting for standard for acquittal). Accordingly, the state PCR court's rejection of this claim is neither contrary to, nor an unreasonable application of, clearly established federal law. *See* 28 U.S.C. § 2254(d)(1).

///

### B. Waiver of Jury Trial and Right to Testify

In Grounds 2(A) and (B), Petitioner alleges that trial counsel failed to (1) "ensure that Petitioner's waivers of his right to trial by jury and to testify was knowing, intelligent and voluntary;" and (2) advise Petitioner of "the benefits and consequences of . . . waiving his right to trial by jury versus having a bench trial, and waiving his right to testify versus testifying on his own behalf." Am. Pet. at 3. In support of these grounds, Petitioner argues:

> Acosta waived his right to trial by jury because his attorney told him that his testimony was essential to his defense and the trial judge would be able to disregard his criminal history while a jury would be negatively affected by it. In the midst of trial, counsel changed course and advised petitioner not to testify. Acosta followed his attorney's advice, and elected not to testify, but felt he had insufficient time to carefully discuss this important issue with his counsel and understand the impact of his decision. An attorney exercising reasonable professional skill and judgment would not have instructed his client to waive a jury trial as a tactical decision made to facilitate the client's testimony and thereafter advise the client not to testify. But for counsel's advice, Acosta would not have waived his right to a jury trial and would have testified in his own defense. Petitioner's testimony would have been persuasive and would have contradicted Pettitt's unopposed testimony. Acosta's testimony would have provided the jury a necessary alternative to Pettitt's account, and evidence to support the argument that Pettitt had fabricated his account.

Pet'r's Br. in Supp. at 26.

Prior to trial, the court discussed Petitioner's desire to waive his right to a jury. Petitioner stated that he read and understood the waiver form, that his attorney went over the form with him, that he understood his right to a jury trial, and that he wished to waive that right. Tr. 16-17. Additionally, Petitioner signed a Waiver of Jury Trial form in which Petitioner affirmed that his attorney explained to him his right to a jury trial. Resp't Ex. 117. At the PCR proceeding, defense counsel submitted a Declaration confirming that he explained to Petitioner his constitutional rights to a jury and to testify, and outlined the reasons he advised Petitioner to waive those rights:

My general practice is to tell all new clients that they and they alone get to make three important decisions in their case: (1) whether to go to trial or work out a plea bargain; (2) if they decide to go to trial, decide whether it should be jury or bench trial and (3) if they decide to go to trial, whether to testify at trial. I followed my general practice in this case. I also told Mr. Acosta that he had an absolute constitutional right to a jury trial, and that he alone could make that decision.

. . . . Mr. Acosta's case was assigned to a judge whom I knew from experience to be a very fair adjudicator of criminal cases. I advised Mr. Acosta to choose a bench trial over a jury trial; however, I made sure to advise Mr. Acosta that he could reject my advice and that he alone could decide whether to have a bench trial or jury trial. I so advised Mr. Acosta because he had an extensive criminal record and if he wanted to testify, a jury would be more swayed by his criminal record than a judge would. I also felt that I had a better chance of prevailing on a "reasonable doubt" argument with a bench trial than I would have had with a jury trial. I also told Mr. Acosta that some jurors would be biased just by the seriousness of the charges. Given the type of charges, and leaving open the possibility of testifying, I believed he would have a better chance of winning with a bench trial than a jury trial.

Petitioner alleges "In the middle of petitioner's trial, after he had waived his right to a jury trial, counsel reversed course and repeatedly told petitioner that he would lose the case if he testified in his own behalf." I never made that statement once, let alone "repeatedly," and I can't imagine telling a client he would lose by testifying. I always tell clients that it is their decision to testify or not. Mr. Acosta told me at some point that he did not want to testify, and I cannot remember when he told me that. I had all the evidence I needed to make a strong "reasonable doubt" argument without his testimony. My opponent, Chris Ramras, was a very experienced DDA and, based on my previous experiences with DDA Ramras, I believed he would have subjected Mr. Acosta to a withering cross-examination. I believe that Mr. Acosta's testimony would not have changed the outcome because the factfinder made clear while announcing his verdict that he believed the victim.

3.   Mr. Acosta alleges that his waiver of his right to testify was not knowing, voluntary and intelligent. In my professional opinion, and based on my interactions with Mr. Acosta, and after advising him of his right to testify, I believe his waiver was knowing, intelligently, and voluntarily made.

Resp't Ex. 116 at 2-3.

Petitioner, in contrast, testified at the PCR proceeding that he waived his right to a jury trial

because he intended to testify and his attorney told him that a judge would be less swayed by his

prior convictions than a jury. Resp't Ex. 124 at 8. Petitioner testified that had he known his attorney

would subsequently advise him not to take the stand, he would not have waived his right to a jury

trial. *Id.* at 8-9.

The PCR Court denied relief, holding that (1) it was reasonable for defense counsel to

suggest that Petitioner waive a jury trial given his "extensive criminal history and . . . [the]

vulnerability of the victim;" (2) Petitioner "clearly understood that he had a right to a jury trial and

he knowingly waived that right;" (3) defense counsel "did not commit errors;" (4) Petitioner failed

to demonstrate that if he testified the result of the trial would have been different; and (5) Petitioner's

testimony at the PCR proceeding "on the important issues" was not credible. *Id.* at 20-21.

In the instant proceeding, Petitioner has failed to demonstrate that the PCR Court's finding

that his testimony was not credible is an unreasonable determination of the facts in light of the

evidence presented. *See* 28 U.S.C. § 2254(d)(1).[4] Further, in light of defense counsel's Declaration

that (1) he advised Petitioner of his constitutional rights and that he alone must decide whether to

waive those rights; (2) he conveyed the reasons why he believed Petitioner had a better chance of

prevailing with a bench trial; (3) Petitioner decided not to testify; (4) he never told Petitioner he

would lose if he testified; and (5) he believed the district attorney would subject Petitioner to a

"withering cross-examination," Petitioner has failed to demonstrate that defense counsel's advice

was deficient, or that there is a reasonable probability that, but for counsel's performance, the result

---

[4] Because the Court concludes that the state court decision is not based on an
unreasonable determination of the facts, it need not address the relationship between 2254(d)(2),
and the more deferential standard set forth in 2254(e)(1) (giving a presumption of correctness to
state court factual determinations). *See Brumfield v. Cain*, 135 S.Ct. 2269, 2282 (2015)
(declining to resolve the "apparent conflict"); *Murray v. Schriro*, 745 F.3d 984, 1000-01 (9th Cir.
2014) (recognizing inconsistency in Ninth Circuit decisions applying these standards).

of the trial would have been different. Accordingly, the PCR court's rejection of this claim is neither

contrary to, nor an unreasonable application of clearly established federal law. *See* 28 U.S.C. §

2254(d)(2).

### C.    Unargued Claims

As to the remaining portions of Ground Two not argued by Petitioner or addressed by the

Court above, Petitioner has failed to sustain his burden to demonstrate that habeas relief is warranted.

*See Lambert v. Blodgett*, 393 F.3d 943, 970 n. 16 (9th Cir. 2004) (petitioner bears burden of proving

habeas relief warranted). Accordingly, habeas relief is denied.

## III.    Ground Three - Ineffective Assistance of Appellate Counsel

In his Third Ground for Relief, Petitioner alleges that appellate counsel was deficient in

failing to raise and preserve "meritorious issues on appeal, including but not limited to failing to

pursue on appeal the imposition of a Measure 11 presumptive sentence." Am. Pet. at 4. Petitioner

did not address this claim in his supporting brief and has failed to demonstrate that habeas relief is

warranted. *See id.*

### CONCLUSION

Based on the foregoing, this Court denies Petitioner's Amended Petition for a Writ of Habeas

Corpus (ECF No. 19). Because Petitioner has not made a substantial showing of the denial of a

constitutional right, a Certificate of Appealability is DENIED. *See* 28 U.S.C. § 2253(c)(2).

IT IS SO ORDERED.

DATED this 30th day of March, 2017.

Garr M. King
United States District Judge

19 - OPINION AND ORDER